*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0132p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

AUTOMATED SOLUTIONS CORPORATION,
　　　*Plaintiff-Appellant/Cross-Appellee*,

　　　*v.*

No. 13-3025/3058

PARAGON DATA SYSTEMS, INC.,
　　　*Defendant-Appellee/Cross-Appellant*.

————————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:05-cv-01519—Lesley Brooks Wells, District Judge.

Argued: May 9, 2014

Decided and Filed:  June 25, 2014

Before:  COLE and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

————————————

**COUNSEL**

————————————

**ARGUED:** Drew A. Carson, Cleveland, Ohio, for Appellant/Cross-Appellee.  Richard S. Mitchell, ROETZEL & ANDRESS, LPA, Cleveland, Ohio, for Appellee/Cross-Appellant **ON BRIEF:** Drew A. Carson, Cleveland, Ohio, Patrick J. Milligan, Steven J. Forbes, NORCHI FORBES LLC, Cleveland, Ohio, for Appellant/Cross-Appellee. Richard S. Mitchell, Christine M. Garritano, ROETZEL & ANDRESS, LPA, Cleveland, Ohio, for Appellee/Cross-Appellant.

————————————

**OPINION**

————————————

　　　CLELAND, District Judge.  On June 21, 2001, Automated Solutions Corporation ("ASC") and Paragon Data Systems, Inc. ("Paragon") entered into a contract to develop

———————————————————

[*]The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

and support computer software for the Chicago Tribune.  This software, called the "Single Copy Distribution System" ("SCDS") would allow the Chicago Tribune to manage and track newspaper deliveries and subscriptions.  Unfortunately, tensions emerged between the two companies and Paragon terminated the contract on September 16, 2003.  ASC sued Paragon in Ohio state court, and after a bench trial, the state court found in ASC's favor and declared that ASC was the sole owner of the SCDS.  Soon after the state court issued its judgment, ASC filed the instant action alleging, *inter alia*, that Paragon had infringed on its copyright and trademark in the SCDS.  After approximately eight years of litigation, the district court granted summary judgment to Paragon on all of ASC's claims.  For the following reasons, we AFFIRM.

## I.  BACKGROUND

### A.  The Development of the SCDS

ASC is an Ohio corporation engaged in the business of developing custom software; Paragon is primarily engaged in providing hardware, equipment, and maintenance support services for the automatic data collection industry.  In 1999, Paragon became aware of a business opportunity with the Chicago Tribune ("the Tribune").  Paragon approached ASC and proposed submitting a bid to the Tribune for custom software, hardware, and pre-packaged software components. On June 21, 2001, ASC and Paragon entered into a Software Development and Ownership Agreement ("SDO Agreement").  Pursuant to the SDO Agreement, ASC and Paragon agreed to jointly develop, own, market, and license software for use by the Tribune and other newspaper companies. The parties soon developed a software tracking system called the "Single Copy Distribution System."  The SCDS utilized "C++" programming language and allowed the Tribune to track newspaper subscriptions through the use of a handheld device that communicated with a remote server.  In August 2001, the parties licensed the SCDS to the Tribune.

**B.  The State Court Litigation**

The business relationship between ASC and Paragon soured.  After an agreement via letter failed to resolve billing disputes between ASC and Paragon, on September 16, 2003, Paragon sent a letter to ASC terminating the SDO Agreement.  Seven days later, ASC sought a declaratory judgment in the Cuyahoga County Court of Common Pleas that ASC had no further obligations to Paragon and that ASC was the sole owner of SCDS.  On February 2, 2005, following a bench trial, the state court held that the SDO Agreement permitted Paragon to market the SCDS to third parties without ASC's written consent, but that it could not actually sell the SCDS to third parties unless ASC consented to the sale.  However, the state court concluded that Paragon waived its rights to the SCDS when it decided to terminate the SDO Agreement instead of seeking legal remedies under the SDO Agreement.  This meant that Paragon's legal rights to any modifications of the SCDS expired on September 16, 2003.  On July 6, 2006, the Court of Appeals of Ohio affirmed.  *Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 856 N.E.2d 1008 (Ohio Ct. App. 2006).

While the state court litigation was pending, Paragon continued its efforts to use the SCDS.  An affidavit submitted by Giles Manias, an officer and shareholder of Paragon, explains that Paragon was under a continued contractual obligation to provide the SCDS to the Tribune, along with technical support for the program.  Manias identifies a former Paragon employee, Brent Anderson, as the individual responsible for translating the SCDS code that ASC provided.  Manias states that Anderson spent a significant amount of time attempting to make the SCDS code usable. In order to facilitate his work, Paragon bought Anderson a "Sun Server," which is an external Oracle database server.  The Sun Server was necessary to performing work on the SCDS because it utilized an external server as part of its method for keeping track of data.  Software code for the SCDS was not written on the Sun Server, but the Sun Server was necessary for Anderson's work in attempting to make the "server side" of the SCDS code workable.  No other Paragon employee had the knowledge necessary to operate the Sun Server.  Despite his efforts, Anderson was unable to make the SCDS code work, and

Paragon terminated his employment in March 2004. Manias also states that by 2004, the handheld devices that the SCDS was originally designed to work on had become obsolete. In order to continue marketing the SCDS, Paragon created a simulation of the SCDS which it used on new handheld devices at a 2004 newspaper trade show. However, this simulation was not functional software; it was purely designed for demonstration purposes. After the state court ruled that Paragon had no rights in the SCDS system, Paragon discarded the Sun Server.

### C. Paragon Develops DRACI

In April 2004, Paragon contacted the Cleveland Plain Dealer, another newspaper, and offered to sell it hardware and software for its newspaper delivery system. The Plain Dealer purchased handheld devices from Paragon in May 2004, but originally intended to develop its own software program to run on these devices. However, time constraints intervened, and the Plain Dealer contacted Paragon in late 2004 to discuss the possibility of Paragon developing software for the handheld devices. The Plain Dealer submitted screen shots of how it wanted the program to look, and Paragon informed the Plain Dealer that it would be creating the program from scratch.

Paragon assigned programmer Brian Atkin to work on the software, which was dubbed "DRACI."[1] DRACI did not utilize a server, and Atkin states via affidavit that he wrote the code "from scratch." In line with the Plain Dealer's specifications, Atkin wrote DRACI utilizing "VB.Net" programming language. Atkin also states that he was the only person at Paragon to write any code used in DRACI, and that he did not work with Anderson, who had already been terminated by Paragon by the time Atkin created DRACI. According to Atkin, "DRACI is not a complicated piece of software" and he composed it "primarily in [his] head." It took less than a month for Atkin to write and deliver DRACI to the Plain Dealer.

---

[1]The parties do not explain whether "DRACI" is an acronym, and if so, what it stands for.

**D. The Federal Litigation**

ASC acquired a federal copyright registration in the SCDS code on February 25, 2005. On April 26, 2005, ASC filed a second suit against Paragon in state court. Paragon removed the matter to federal court, and ASC filed an amended complaint alleging copyright infringement, trademark infringement, breach of contract, conversion, tortious interference with a business relationship, unjust enrichment, and unfair competition on the basis of Paragon's alleged copying of the SCDS software to use in its DRACI software. After numerous discovery disputes, the district court noted that "Paragon appears to have failed in its duty to preserve information because of pending or reasonably anticipated litigation." Because Paragon had not produced documentary evidence of its DRACI code development to ASC, the court ordered Paragon to submit to a forensic expert investigation of its computer systems for evidence that Paragon copied the SCDS software when it created DRACI. The court allowed ASC to choose whether it wanted this forensic examination to take place, as well as the forensic examiner it wished to use, but ordered that ASC would pay for any forensic examination it chose to conduct.

ASC decided to proceed with the forensic examination and selected Visual Evidence/E-Discovery LLC ("Visual Evidence") as its forensic examiner. Visual Evidence interviewed Paragon representatives, determined relevant sources of electronically stored information, and analyzed the forensic images it obtained from Paragon's email server and Atkin's hard drive. Visual Evidence concluded that its ability to obtain potentially relevant evidence was inhibited for three reasons:

> (1) Atkin's former personal computer's hard drive failed, and files were not transferred to his current personal computer (both of which were used for his work with Paragon).

> (2) Anderson's personal computer (again, used for work with Paragon) was not maintained or archived after his departure.

> (3) Paragon used a faulty back-up tape which did not accurately record information.

Visual Evidence further noted that "considering that Paragon is an information technology based company, it is arresting that they operated without a fully functional back-up system from 2003 through 2006 when the new system was employed." It is not apparent from the report that Visual Evidence discovered any evidence supporting ASC's claim that Paragon derived DRACI from the SCDS.

Paragon disputed the completeness of Visual Evidence's report. Specifically, via affidavit, Manias states that Anderson and Atkin's failed hard drives may still be in Paragon's possession as Paragon maintains a set of "dead drives" that failed in the ordinary course of business. However, because it does not track the serial numbers of each of its employees' hard drives, Paragon is unable to determine whether Anderson and Atkin's hard drives are among its collection of "dead drives." Nevertheless, Manias further states that he informed Visual Evidence of these hard drives, and Visual Evidence chose not to examine the drives or note their existence in its report.

As part of the forensic computer examination, both Visual Evidence and Paragon's own e-discovery consultant, Vestige Ltd., conducted electronic searches designed to filter out attorney-client privileged files. Unfortunately, both Visual Evidence and Vestige missed two emails between Paragon and its attorneys. ASC filed these emails with the court for *in camera* review and asked for case-terminating sanctions based on their content. Paragon moved to strike the emails, noting that they were subject to a claw-back agreement between the parties, were disclosed inadvertently, and that Paragon had promptly asserted attorney-client privilege over the emails, demanding their return. The district court granted Paragon's motion to strike, noting that Paragon's disclosure of the emails appeared inadvertent and that Paragon had taken reasonable steps to prevent the disclosure of privileged material during a "voluminous document production."

Based on Visual Evidence's report, ASC moved for sanctions and an award of attorneys' fees, arguing that Paragon had deliberately destroyed evidence relevant to the case. Paragon, in turn, moved for summary judgment, arguing that ASC had not submitted any evidence that Paragon had copied the SCDS or that DRACI was

substantially similar or derived from the SCDS.  The district court referred both motions to a magistrate judge.

The magistrate judge issued two separate report and recommendations, ("R&Rs") advising that the district court grant ASC's motion for sanctions in part, and that it further grant Paragon's motion for summary judgment in part.

Addressing ASC's motion for sanctions, the magistrate judge found that Paragon failed to institute any systematic document retention policy, and further failed to institute a litigation hold after it was first sued by ASC.  This failure resulted in the disposal of the Sun Server, Atkin and Anderson's failed hard drives, and a belatedly-disclosed work report for Anderson's activity at Paragon, all of which would have been subject to Paragon's duty to preserve evidence.  However, based on the affidavits Paragon submitted, the magistrate judge recommended finding that Paragon was at most negligent, and that it had not acted with any degree of willful or malicious behavior. Regarding the Sun Server, the magistrate judge reasoned that ASC was unable to contradict Paragon's assertions that it did not use the Sun Server in the development of DRACI, therefore rendering its absence irrelevant.  And although ASC argued that it should have received the Anderson work reports earlier in the litigation, the magistrate judge noted that ASC had since received the reports, and they did not appear to be relevant.  Lastly, as to the Anderson and Atkin hard drives, the magistrate judge concluded that although the Anderson hard drive appeared irrelevant, Atkin was undisputedly the author of the DRACI software and "the precise circumstances of DRACI's creation are very much relevant to ASC's infringement claim."  Because of Paragon's negligence in maintaining Atkin's hard drive, the magistrate judge recommended that the district court consider instructing a jury that it may "infer, after considering all the evidence, that the Atkin hard drive contained evidence showing that Paragon's DRACI code was derived from ASC's SCDS code."  In taking this "middle ground," the magistrate reasoned that although it did not condone Paragon's negligence, any adverse inference sanction should be considered at trial, rather than imposing such a sanction at the summary judgment stage.

Turning to Paragon's motion for partial summary judgment, the magistrate judge recommended granting summary judgment to Paragon on ASC's copyright infringement claim because ASC had not identified what portions of the SCDS software were protectable under the Copyright Act. Instead, ASC had extensively argued that there was evidence that Paragon either directly copied the SCDS software or that it had access to the software and that substantial similarity resulted, thereby raising the reasonable inference that copying had occurred. But in not identifying *which* portions of the SCDS software were subject to copyright protection, ASC had "thus failed to provide any basis by which a jury could determine that Paragon infringed on anything." The magistrate judge recommended that Paragon's motion for summary judgment as to ASC's other claims be denied.

The district court adopted the magistrate judge's R&Rs in part, and dismissed ASC's remaining claims. The court characterized ASC's argument that it was not properly put on notice as to its burden of proof for its copyright infringement claim as "utterly confounding and specious." The court further noted that ASC's expert testimony was "replete with insufficient conclusory statements" and failed to "identify those elements comprising the unique protectable expression of [the] SCDS." For these reasons, the court concluded that the factual basis for the copyright claim was insufficient to submit to a jury.

Turning to ASC's remaining claims, the court reasoned that because the gravamen of ASC's claims was that the DRACI software infringed upon the SCDS software, ASC's remaining claims were contingent upon its infringement claim and should also be dismissed. To the extent the court interpreted ASC's claims as arising out of Paragon's use of the SCDS, the court held that these claims could have been raised in the state court proceeding and thus *res judicata* barred them. Lastly, the court noted the magistrate judge's recommendation that it consider an adverse inference instruction in favor of ASC, but concluded that sanctions were moot given its dismissal of the remainder of ASC's claims.

## II.  ANALYSIS

### A.  Discovery Disputes

"A federal court's inherent powers include broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009) (*en banc*) (hereinafter, "*Adkins I*").  We review a district court's decision whether to impose sanctions for abuse of discretion. *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010).  "A court abuses its discretion when it commits a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Id.* (citation omitted).  The severity of a sanction often depends on the party's fault. *Adkins I*, 554 F.3d at 652–53. However, "the fact-intensive inquiry into a party's degree of fault is for a district court" to determine, and we recognize that district courts enjoy relatively broad discretion in this area. *Id.* at 653.  District courts may "impose many different kinds of sanctions for spoliated evidence, including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence." *Id.*

> [A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 553 (6th Cir. 2010) (citation omitted). "The test prescribed in *Beaven* is conjunctive; thus, so long as the district court did not err in determining that [a party] had not satisfied at least one of the prongs, its determination that a spoliation sanction was not warranted should not be upset." *Adkins v. Wolever*, 692 F.3d 499, 504 (6th Cir. 2012) (hereinafter, "*Adkins II*").  "Whether an adverse inference is permissive or mandatory is determined on a case-by-case basis, corresponding in part to the sanctioned party's degree of fault." *Flagg v. City of Detroit*, 715 F.3d 165, 178 (6th Cir. 2013).

On appeal, ASC raises a host of arguments that the district court abused its discretion by denying ASC's motion for sanctions against Paragon. Specifically, ASC asserts that on the basis of Paragon's alleged violations, the district court should have terminated the case, entered judgment in ASC's favor, sanctioned Paragon's attorneys, and awarded ASC attorneys' fees. Each of ASC's discovery arguments is addressed in turn.

### 1. Anderson's Hard Drive and the Sun Server

Regarding both Anderson's hard drive and the Sun Server, the magistrate judge concluded, and the district court agreed, that Paragon had a duty to preserve these pieces of evidence, and that it was negligent in failing to do so. Nevertheless, the magistrate judge and the district court found that ASC had not met its burden in showing that the Sun Server and Anderson's hard drive contained evidence relevant to this litigation. ASC disputes the district court's finding that the Sun Server and hard drive did not contain relevant evidence, and argues that it made a "compelling showing" that information relevant to its claims would have been found in the Anderson hard drive and the Sun Server, had Paragon not discarded them.

In this context, "relevant" means: "something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the nature alleged by the party affected by its destruction." *One Beacon Ins. Co. v. Broad. Dev. Group, Inc.*, 147 F. App'x 535, 541 (6th Cir. 2005) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108–09 (2d Cir. 2002)) (brackets in original, internal quotation marks omitted).[2] "A party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence." *Beaven*, 622 F.3d at 555 (citation and brackets omitted).

---

[2]We note that a new version of Fed. R. Civ. P. 37(e), which would require a higher burden of proof for an adverse inference instruction, is under consideration by the relevant Rules Committees.

ASC does not cite any evidence that suggests that either Anderson or the Sun Server that he worked on were used to develop the DRACI software. ASC repeats its assertions (and the magistrate judge agreed) that Paragon was under a duty to preserve the hard drive and the Sun Server and that Paragon was negligent in failing to preserve both pieces of equipment. However, whether Paragon was negligent in failing to preserve the Sun Server and hard drive does not advance a showing of relevance, which is a necessary finding for the district court to impose sanctions. To the extent that ASC cites a transcript of an interview that its investigator held with Anderson as support for its argument that Paragon used the SCDS as a model for DRACI, we note that the interview appears to have been highly suggestive, and in any event, Anderson's statements during the interview are unsworn, and thus of limited reliability.[3] The district court did not clearly err in determining that a reasonable trier of fact could not find that the missing Anderson hard drive and Sun Server would support ASC's claims.

### 2. Paragon's Back-up Tapes

ASC argues that the magistrate judge improperly concluded that Paragon's back-up tapes were not subject to Paragon's duty to preserve evidence. ASC asserts that a back-up system used by Paragon from 2003–2005 should have been preserved and produced in the course of the instant litigation. According to Manias, Paragon used an "I-Omega" back-up system to insure that its electronically stored information would be recoverable in the event of a problem with its main storage system. However, as part of this system, the back-up tapes were overwritten daily. At some point, the system failed, and Paragon discarded the back-up tapes because the information on the tapes was not retrievable.

The magistrate judge rejected ASC's assertion that the back-up tapes should have been subject to Paragon's duty to preserve. The magistrate judge reasoned that in *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003),[4] the court noted that

---

[3] It does not appear that either party ever deposed Anderson.

[4] *See* n. 1.

a "litigation hold does not apply to inaccessible backup tapes (*e.g.*, those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy." *Id.* at 218; *see also Forest Labs., Inc. v. Caraco Pharm. Labs.,* LTD, No. 06-CV-13143, 2009 WL 998402, at \*4 (E.D. Mich. April 14, 2009) (concluding that where defendants had offered no evidence that the tapes in question were maintained for any purpose other than disaster recovery, the tapes were not subject to the duty to preserve); The Sedona Principles, Second Edition: *Best Practices, Recommendations & Principles for Addressing Electronic Document Production* at 35–36 (The Sedona Conference Working Group Series, 2007) *available at https://thesedonaconference.org/download-pub/81* ("Absent specific circumstances, preservation obligations should not extend to disaster recovery backup tapes created in the ordinary course of business."). The magistrate judge criticized Paragon for not having a systematic document retention policy in place, but nevertheless concluded that because the only evidence in the record suggested that the back-up tapes were rewritten daily and used only for disaster recovery, they were not subject to Paragon's duty to preserve.

ASC argues that the magistrate judge did not properly apply *Zubulake*'s reasoning because once Anderson and Atkin's hard drives failed, the back-up tapes became the only way to access Anderson and Atkin's information, and thus should have been preserved. *See Zubulake*, 220 F.R.D. at 218. However, this argument does not address the unrebutted facts that the back-up tapes were re-written daily and only used for disaster recovery.[5] Further, the only evidence before the magistrate judge suggested that the back-up tapes failed and were effectively useless as a disaster recovery system. Although ASC asserts that once Anderson and Atkin's hard drives failed, Paragon should have immediately preserved the back-up tapes, there is no indication as to when the hard drives failed in relation to when the back-up tapes ceased working properly.

---

[5] We note ASC's expert's declaration takes issue with Paragon's representation that its back-up tapes failed and were discarded. However, although ASC's expert reiterated that Paragon's document retention policy was extremely poor and expressed skepticism that Paragon does not have more information that it has not disclosed, he did not advance any evidence suggesting that Paragon's back-up tapes were used as an archive in the normal course of business, thus bringing them within the normal ambit of Paragon's duty to preserve.

Even assuming that Paragon had retained the back-up tapes, it is not at all clear that useful evidence would have been gleaned from the tapes, or that any data would have been recoverable. Based on the evidence before it, we conclude that the district court did not abuse its broad discretion in adopting the R&R's conclusion that the back-up tapes were not subject to Paragon's duty to preserve evidence.

### 3. Paragon's Culpability

ASC asserts that the magistrate judge wrongly found that Paragon's failure to preserve evidentiary items was "at most" negligent, rather than willful or grossly negligent. "The ultimate determination of culpability is within the district court's discretion so long as it is not a clearly erroneous interpretation of the facts. . . . Even if we were to disagree with the district court's ultimate conclusion on culpability, it does not necessarily follow that the district court's determination should be upset." *Adkins II*, 692 F.3d at 505–06.

ASC cites *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities*, 685 F. Supp. 2d 456 (S.D.N.Y. 2010). In *Pension Committee*, the court stated that in the context of discovery misconduct: "Conduct is either acceptable or unacceptable. Once it is unacceptable the only question is how bad is the conduct." *Id.* at 463. The *Pension Committee* court placed great emphasis on *Zubulake*'s effect on electronic discovery standards:

> A failure to preserve evidence resulting in the loss or destruction of relevant information is surely negligent, and, depending on the circumstances, may be grossly negligent or willful. For example, the intentional destruction of relevant records, either paper or electronic, after the duty to preserve has attached, is willful. Possibly after October, 2003, when *Zubulake IV* was issued, and definitely after July, 2004, when the final relevant *Zubulake* opinion was issued, the failure to issue a *written* litigation hold constitutes gross negligence because that failure is likely to result in the destruction of relevant information.

*Id.* at 465 (footnotes omitted) (emphasis in original). The *Pension Committee* court further stated that: "Relevance and prejudice may be presumed when the spoliating party acted in bad faith or in a grossly negligence manner." *Id.* at 467. ASC cites

*Pension Committee*'s language to argue that the magistrate judge misapplied the relevant law, and thus abused his discretion, by concluding that despite Paragon's lack of any systematic document retention system, its conduct was merely negligent, rather than willful or grossly negligent. ASC therefore argues that the relevance of Paragon's spoliated evidence is therefore presumed, making it a further abuse of discretion for the district court to deny severe sanctions for Paragon's conduct.

There is reason to doubt *Pension Committee*'s persuasive effect. To begin with, the Second Circuit directly criticized *Pension Committee*'s broad language: "We reject the notion that a failure to institute a 'litigation hold' constitutes gross negligence *per se*." *Chin v. Port Auth. of N.Y & N.J.,* 685 F.3d 135, 162 (2d Cir. 2012). The Second Circuit reasoned instead that "the better approach is to consider [the failure to adopt good preservation practices] as one factor in the determination of whether discovery sanctions should issue[,]" and that a finding of gross negligence does not mandate an adverse inference instruction. *Id.* (quotation marks omitted). Rather, "[the Second Circuit has] repeatedly held that a case-by-case approach to the failure to produce relevant evidence, at the discretion of the district court, is appropriate." *Id.* (quotation marks omitted).

This case-by-case approach is the law in our circuit as well. We recognize that district courts are best positioned to adjudicate discovery disputes, as they have the most contact with the parties, the personalities, and the litigation. We have previously characterized the inquiry into a party's degree of fault as "fact-intensive" and within the "broad discretion" of the district courts. *Adkins*, 554 F.3d at 653. Additionally, we have declined to impose bright-line rules, leaving it instead to a case-by-case determination whether sanctions are necessary, and if so, what form they must take. *See Flagg*, 715 F.3d at 178. Thus, the appropriate inquiry on appeal is whether the district court committed a "clear error of judgment," not a de novo fact-based determination of which party was more at fault. *Jones*, 617 F.3d at 850. Our review of the record in this case demonstrates that there was ample support for the district court's determination that Paragon was at most negligent.

The magistrate judge first noted an affidavit from Manias, who attested that Paragon never intentionally withheld or destroyed evidence, and at all times complied in good faith with its discovery obligations. Manias also stated that Paragon is a small company with only eleven employees. Additionally, Paragon submitted affidavits from many of its prior attorneys in both the state and federal ligation, all attesting that they were not aware of any evidence withholding, and that they believed Paragon's discovery responses were truthful and accurate when they were made. Despite ASC's attempts to cast doubt on the notion that Paragon and its counsel acted in good faith, it did not submit any evidence suggesting that Paragon willfully withheld evidentiary material.

This is not to say that we applaud Paragon's conduct in this litigation. As ASC repeatedly points out in its brief, Paragon is an information-technology company, and thus could be expected to have a better-than-average understanding of electronic discovery and the necessity for functioning back-up tapes and the preservation of data. Paragon's behavior *was* negligent; but we are unwilling to say that the district court abused its discretion in determining that it was not grossly so. Instead, after considering all of the evidence before it, the district court determined that severe sanctions were improper. Given the support found in the record for this determination, the district court did not commit a clear error of judgment, and thus, did not abuse its discretion in finding that Paragon was negligent.

### 4. Paragon's Privileged Material

ASC argues that the district court improperly struck two email exhibits as protected by attorney-client privilege. "We review the decision to grant or deny a motion to strike for an abuse of discretion, and decisions that are reasonable, that is, not arbitrary, will not be overturned." *Dassault Systemes, SA v. Childress*, 663 F.3d 832, 846 (6th Cir. 2011) (citation omitted). However, "whether the attorney-client privilege applies is a mixed question of law and fact, subject to de novo review." *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 712 (6th Cir. 2006) (citation omitted).

"The purpose of attorney-client privilege is to ensure free and open communications between a client and his attorney." *In re Grand Jury Subpoenas*,

454 F.3d 511, 519 (6th Cir. 2006).  The privilege "may be overridden . . . by the so-called crime-fraud exception, encompassing advice given with respect to ongoing or future wrongdoing."  *Id.* at 520.  When a party asserts that the crime-fraud exception applies, district courts may conduct an *in camera* inspection of the allegedly privileged documents.

> Before engaging in *in camera* review to determine the applicability of the crime-fraud exception, the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.
>
> Once that showing is made, the decision whether to engage in *in camera* review rests in the sound discretion of the district court.  The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*United States v. Zolin*, 491 U.S. 554, 572 (1989) (citations and quotation marks omitted).

ASC asserts that two emails between Paragon and its counsel demonstrate that Paragon had an intent to obstruct justice throughout the discovery process.  Paragon argues that the emails are presented without their full context, that its officers' words "merely represent the ongoing frustration of Paragon at ASC's continued attempt to gain access to information that is entirely irrelevant to this matter," and that, in any event, the emails were privileged communications and subject to a claw-back agreement between the parties.

After reviewing the emails at issue, the district court concluded that ASC had not shown that there was a good faith basis to believe that an *in camera* review of the emails or other inadvertantly produced documents would show that the crime-fraud exception should apply.  On appeal, ASC argues that the emails are *prima facie* evidence of the applicability of the crime-fraud exception.  We disagree.

The district court considered the history of litigation between the parties, as well as the content of the emails themselves. Instead of being the smoking gun that ASC believes the emails to be, it appears that they reflect Paragon's frustration with the length of the litigation, as well as with the ongoing discovery disputes. The emails ASC cites do not discuss violating a current order, nor do they seek advice regarding future illegal conduct. Rather, they appear to discuss the ongoing discovery litigation process, a subject undoubtedly within the purview of the attorney-client relationship. Further, there is no indication that Paragon's counsel responded to these emails with legal advice concerning how to circumvent Paragon's discovery obligations. Because the district court's decision to deny ASC's request for an *in camera* review and strike the emails from the record was reasonable, and not arbitrary, we affirm.[6]

**B. Summary Judgment**

ASC also challenges the district court's grant of summary judgment to Paragon on all of ASC's claims. "We review a district court's decision granting summary judgment de novo." *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008) (citation omitted).

*1. Copyright Infringement*

In order to establish copyright infringement, ASC must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Paragon challenged the second element of this test, specifically whether there is a substantial similarity between the protectable elements of the SCDS and DRACI.

We use a two-part test for determining substantial similarity. First, we "identify and eliminate those elements [of a work] that are unoriginal and therefore unprotected." *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003). Next, we determine "whether the

---

[6]We also note Paragon's argument that the emails were subject to a claw-back agreement between the parties. Although such agreements are generally enforceable, *see* Fed R. Evid. 502(e), no such agreement between the parties has been submitted.

allegedly infringing work is substantially similar to protect[a]ble elements of the original." *Id.* at 856. "It is axiomatic . . . that mere abstract ideas are not protect[a]ble, but the expression of an idea is." *Id.* at 855. When the work at issue is functional, rather than creative, "it is necessary to eliminate those elements dictated by efficiency." *Id.* at 856.

"In ascertaining this elusive boundary line between idea and expression, between process and non-functional expression, courts have looked to two other staples of copyright law—the doctrines of merger and scenes a faire." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 535 (6th Cir. 2004) (citation omitted). Merger refers to situations where "expression is essential to the statement of the idea" or "where there is only one way or very few ways of expressing the idea." *Id.* In these instances, the idea and expression have merged, and copyright law provides no protection. In contrast, scenes a faire describes instances "when external factors constrain the choice of expressive vehicle," thereby precluding protection. *Id.* "In the computer-software context, the doctrine means that the elements of a program dictated by practical realities—*e.g.*, by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices—may not obtain protection." *Id.*

Addressing Paragon's argument that it was entitled to summary judgment because ASC could not prove substantial similarity, the magistrate judge relied on our decision in *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010). In *Olmstead*, the plaintiff software and hardware company brought suit alleging copyright infringement based on the defendant's alleged copying of the plaintiff's software. *Id.* at 266–68. However, the district court granted summary judgment to the defendant, and we affirmed, noting that "[the plaintiff] has not attempted to identify any original elements of its software that [the defendant] copied." *Id.* at 275. Because the plaintiff did not identify those elements of its software that it claimed were original, and therefore subject to copyright protection, "its substantial similarity analysis [did] not filter

elements that would be expected to be common to any . . . software, those dictated by the particular business practices." *Id.* Accordingly, we concluded that the plaintiff had failed to create a triable issue of fact as to whether the defendant had copied original elements of the plaintiff's software. *Id.* at 276.

Following *R.C. Olmstead*, the magistrate judge observed that ASC had not "even attempt[ed] to specify exactly what portions of the SCDS software are protectable, original elements and which are unprotectable." The magistrate judge further reasoned that although "ASC has extensively argued its *conclusion* that Paragon's software is substantially similar to its SCDS code . . . it has offered no evidence . . . by which a jury could arrive at that conclusion. Given that ASC had made no showing which elements of the SCDS were subject to copyright protection, and therefore at issue in this lawsuit, the magistrate judge noted that the court was "hamstrung" and unable to engage in the necessary first step of the substantial similarity analysis.

ASC objected to the magistrate judge's recommendation that the district court grant Paragon summary judgment on ASC's copyright claim, arguing (1) that Paragon had not moved for summary judgment on the grounds that ASC had failed to show which elements of the SCDS were original and protected, and (2) that ASC had submitted enough evidence of the original, protectable elements of the SCDS to allow a reasonable jury to find in its favor.

The district court rejected both arguments. First, it characterized ASC's assertion that it was not put on notice regarding the burden of proof for its copyright infringement claim as "utterly confounding and specious." Turning to ASC's argument that it had submitted sufficient evidence to create a genuine issue of material fact, the court noted that ASC had never submitted any evidence identifying the unique protectable elements of the SCDS, and that there was "insufficient evidence to generate even an implication that DRACI [is] substantially similar to SCDS."

On appeal, ASC again argues that it was not on notice that it needed to submit evidence identifying the protectable portions of the SCDS software, that it submitted sufficient evidence to justify submitting the matter to a jury, and that the district court's

adoption of the magistrate judge's recommendation that it consider an adverse jury instruction at trial for the spoliated Atkin hard drive precluded summary judgment.

Paragon moved for summary judgment on the grounds that ASC "cannot establish that there is substantial similarity between the DRACI software system and the SCDS system." It stated that it was focusing "solely on the issue of substantial similarity" for its motion, and identified the *Kohus* test discussed above, which requires a court to "identify and eliminate those elements [of a work] that are unoriginal and therefore unprotected." *Kohus*, 328 F.3d at 853. Paragon then identified eight reasons why DRACI could not have been copied from the SCDS, and argued that for any of these reasons, summary judgment was appropriate.

When moving for summary judgment, the movant has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita v. Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Here, Paragon moved for summary judgment on the issue of substantial similarity. At this point, it became ASC's burden to advance enough evidence for a reasonable juror to find in its favor. As noted above, the substantial similarity test has two prongs: ASC chose not to address the first prong, and instead focused on the second. The record demonstrates that Paragon's motion for summary judgment put ASC on notice that its ability to satisfy the substantial similarity test was at issue, and its arguments to the contrary are without merit.**7**

---

**7**In its appellate brief, ASC asserts that "[i]t is not disputable that Paragon did not move for summary judgment . . . on grounds that [ASC] did not own a valid copyright in SCDS." (Appellant Br. at 56.) This is true; however, ASC conflates the issue of whether it owned a copyright in the SCDS with whether it had identified which *portions* of the SCDS were subject to copyright protection, which is the first step of the substantial similarity test.

Turning to whether ASC submitted sufficient evidence to show which portions of the SCDS were original, and therefore subject to copyright, we also agree with the district court that ASC did not meet its burden. ASC relies on the declaration of its expert, Dr. Wolfgang Pelz, as identifying the unique portions of the SCDS software code. Dr. Pelz is a professor emeritus of computer science at the University of Akron. He states that he "distilled" the SCDS software to its "unique protectable expression," but does not elaborate *which* portions of data are unique, *what* makes them unique, or *why* their particular form is not dictated by practical realities, *see Lexmark*, 387 F.3d at 535, and therefore not subject to copyright protection. The most detail that Dr. Pelz's declaration provides is in reference to data structures used in a Paragon "VB.net" file. Dr. Pelz states that the "field names, field types, field lengths, and the order of the fields within the data structures" within the VB.net file are similar to the SCDS code/software. Again, it is not at all clear from Dr. Pelz's declaration that these elements are subject to copyright protection, how they are similar to the SCDS, or why they "go well beyond what could be attributable to common usage, software/hardware requirements, or best practices." As we stated in *R.C. Olmstead*, "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead*, 606 F.3d at 271 (citation omitted); *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009) ("Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment."). Dr. Pelz's declaration includes no attempt at explaining this "how" and "why," and instead focuses solely on his legal conclusion that Paragon "infringed Automated's rights in and to the SCDS code/software." Without more, this is not enough to create a genuine issue of material fact as to whether Paragon copied original elements of ASC's software. *See R.C. Olmstead*, 606 F.3d at 275.

Lastly, ASC argues that, because the magistrate judge recommended that ASC was entitled to an adverse inference instruction regarding Atkin's spoliated hard drive, this instruction alone creates an issue of material fact that precludes summary judgment. The adverse inference instruction permits a finding that Paragon derived DRACI from the SCDS (the second prong of substantial similarity). That finding would not help ASC

here because ASC's problem is that it cannot establish which, if any, elements of the SCDS are subject to copyright protections (the first prong of substantial similarity). We thus find no error in the district court's reasoning that its grant of summary judgment in favor of Paragon due to ASC's inability to identify the protectable elements of the SCDS made the adverse inference instruction irrelevant to the issue.[8]

### 2. *ASC's Remaining Claims*

ASC also appeals the district court's entry of summary judgment on the basis of *res judicata* for its remaining claims alleging trademark infringement, tortious interference with business relationships, unjust enrichment, and unfair competition. ASC argues that because these claims focus on whether Paragon marketed, copied, or monetized the SCDS after Paragon's breach of the agreement, the claims survive independently from ASC's copyright claim.

ASC forfeited this argument. "Waiver is different than forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted). Despite filing an appellate brief comprising over sixty pages, ASC devotes a single paragraph to its argument that *res judicata* should not apply, leaving us to guess what it means, or why the district court's application of *res judicata* was erroneous. ASC cannot wait until the closing pages of its brief to raise an argument in a single paragraph that we should reverse and preserve the majority of its claims against Paragon.

### III. CONCLUSION

For these reasons, we AFFIRM.

---

[8]Because we affirm the district court's grant of summary judgment to Paragon on ASC's copyright claim, we do not find it necessary to reach Paragon's cross-appeal which argues that the district court erred by adopting the magistrate judge's recommendation that it consider imposing an adverse-inference jury instruction for Atkin's spoliated hard drive at trial.