*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0074p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
————————————

MARK BROWN,

　　　　　　　　*Plaintiff-Appellee,*

　　　　*v.*

　　　　　　　　No. 09-4396

CITY OF UPPER ARLINGTON,

　　　　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 08-00849—Norah McCann King, Magistrate Judge.

Argued: January 19, 2011

Decided and Filed: March 25, 2011

Before: BATCHELDER, Chief Judge; MARTIN and SUTTON, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Brandi L. Dorgan, ISAAC, BRANT, LEDMAN & TEETOR, LLP, Columbus, Ohio, for Appellant. Mark G. Kafantaris, Columbus, Ohio, for Appellee. **ON BRIEF:** Brandi L. Dorgan, Mark D. Landes, ISAAC, BRANT, LEDMAN & TEETOR, LLP, Columbus, Ohio, Jeanine A. Hummer, Thomas K. Lindsey, CITY OF UPPER ARLINGTON, Upper Arlington, Ohio, for Appellant. Mark G. Kafantaris, Columbus, Ohio, for Appellee.

————————————

## OPINION

————————————

SUTTON, Circuit Judge. A tree once grew in Upper Arlington. When the City decided to cut it down, the adjacent homeowner protested. First in front of the City's Tree Commission, then in state court, ultimately in federal court, the parties vied over the propriety of removing the tree and eventually over whether the courts should enjoin

1

the City from moving ahead with its plans.  Soon after the federal district court ruled in favor of the City, a group of City employees, over the protest of the homeowner, removed the 40-year-old tree.  The homeowner was not pleased, having lost not just the tree but the basis for any further litigation as well.  The district court was none too happy either, and it sanctioned the City for contempt of court.

Although we appreciate the district court's frustrations with the City's conduct, we see no basis for using the contempt power to deal with the problem.  The federal courts' traditional contempt power does not apply because the City did not violate any order:  No formal injunction existed, whether before the court's decision or after it; the informal agreement between the parties and the court to hold off on the tree cutting ended with the court's decision rejecting Brown's claim; and the Federal Rules of Civil Procedure do not automatically stay this kind of judgment, *see* Fed. R. Civ. P. 62(a), (c). The federal courts' "inherent" contempt power does not apply either:  Brown did not seek a stay pending appeal, and at most signaled a desire to refile his state law claim in state court, which would give the state courts, not the federal courts, the inherent power to protect their jurisdiction.  We vacate the decision and remand the case to the district court.

## I.

In front of Mark Brown's house, next to a public street, once stood a 40-year-old sweet gum tree planted by the City of Upper Arlington, a suburb of Columbus, Ohio, that 34,000 people call home.  *See* City of Upper Arlington, *About UA*, http://www.uach.net  (last visited Mar. 23, 2011).  The tree was on City property.

In April 2008, Steven Cothrel, the Superintendent of the City's Parks and Forestry department, told Brown that the tree was decayed and dying, that the City planned to remove the tree as a result and that it would replace the old tree with a new one.  Brown responded that the tree was "quite healthy" and asked for a hearing to contest the tree's removal.  R.11-1.

Brown appeared twice before an entity known as the Upper Arlington Tree Commission, the modest jurisdiction of which extends to making non-binding recommendations to the City about arboreal matters. In each instance, Brown claimed that the tree was just fine and that the City had no basis for taking it down. In August, the Commission denied Brown's appeal, after which Cothrel wrote Brown a letter saying the City would remove the tree.

Brown wrote back, accusing Cothrel of "transcend[ing] the bounds of decency and professionalism" and of coming up with pretextual reasons for cutting down the tree. R.11-3 at 1. Cothrel "made a mistake," the letter continued, when he first decided to remove the tree, and he was "not professional enough to admit it." *Id.* Brown concluded by asking the City not to remove the tree while he considered filing a lawsuit. The City obliged, for then.

On September 2, 2008, Brown filed a complaint in state court, claiming that the tree cutting would violate his rights under the substantive due process and equal protection guarantees of the Fourteenth Amendment and under a city ordinance. He asked for a temporary restraining order, which the state court granted. On September 10, the City removed the action to federal court based on federal-question jurisdiction.

The parties consented to disposition by a magistrate judge, who held an evidentiary hearing on September 24. Noting that the state court's temporary restraining order had expired, the court told the parties that "I would expect that between now and the time the Court issues its decision, . . . if the city undertakes or concludes that it intends to take action, I would expect the city to notify plaintiff's counsel and the Court immediately." R.34 at 116. The City agreed.

In an opinion dated October 28, a Tuesday, the court rejected Brown's federal claim on the merits and opted not to resolve the state claim. The court also rejected Brown's request for a preliminary injunction. The next day, the court entered a final judgment dismissing the case. That same day, October 29, Brown's lawyer spoke to the City's outside counsel and told her that Brown would refile his complaint in state court no later than Friday, October 31.

At around 9:00 a.m. the next morning, Thursday, October 30, Cothrel arrived at Brown's house with an entourage of 10 or so, including a police officer in a cruiser and a city worker driving a "cherry-picker." R.22-2 at 2. Cothrel told Brown that the City Attorney, Jeanine Hummer, had authorized him to cut down the tree. Brown and his attorney tried to reach Hummer and the City's outside counsel to stop the removal, but they got nowhere. Despite Brown's protests—he told Cothrel that removing the tree "constituted a criminal contempt of court" and was an "obstruction of justice"—the city workers cut the tree to a stump. *Id.* at 3. The record does not reveal whether the City, as promised, planted a new tree and if so what kind of tree it is.

Brown moved for reconsideration in the district court and for a finding that the City was in contempt of court. The court denied the motion for reconsideration. Invoking its "inherent power," the court granted the contempt motion, finding that the City "intentionally destroyed the Tree the preservation of which was the subject of the litigation," and that the "City's actions foreclose to plaintiff the possibility of meaningful review by either this Court [or] the Court of Appeals of the judgment . . . or pursuit in any meaningful fashion of the state court claim preserved to plaintiff by this Court's judgment." R.31 at 9. The court ordered the City to replace the tree with "one of comparable genus" and to pay the attorney's fees incurred by Brown in filing the contempt motion. *Id.* at 10. The City appealed.

II.

The easy part of this appeal is appreciating the district court's frustration with the City's sharp-elbowed conduct. The case was coming to an end, and Brown already had been given considerable process over an uphill set of claims: (1) a purported right under the Fourteenth Amendment to prevent a city from cutting down its own tree; and (2) a purported right under local law to prevent a city from cutting down a 40-year-old tree that its experts thought "was going to imminently fall on some child walking to the nearby school." R.34 at 34. A stay pending appeal thus seemed doubtful in the federal case, and in light of the federal court ruling it seems equally doubtful that the threatened refiling in state court would lead to a preliminary injunction. Had the City honored

Brown's request to wait even a few days more, a not-unreasonable request in view of the month and a half the parties already had waited for resolution of the federal case, it seems likely that the case, if not the tree, soon would have come to a natural end.

Why the City and its outside counsel did what they did is hard to justify, as the district court understandably concluded. What to do about it is another matter.

Federal courts have broad contempt power, which exists for the "preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 798 (1987) (internal quotation marks and citation omitted). One of the "underlying concern[s] that gave rise to the contempt power," and the most salient reason for invoking it, is the "disobedience to the orders of the Judiciary." *Id.* No one thus doubts that a court may punish parties for "willful disobedience of a court order." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (contempt power used to dismiss case based on plaintiffs' refusal to answer defendant's interrogatories) (internal quotation marks omitted); *see also Young*, 481 U.S. at 789–90 (contempt power used to punish violation of a permanent injunction). And that is true even if the conduct occurs outside the proceedings at hand, *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991), and even if the court issued the underlying order in error, *see United States v. United Mine Workers of Am.*, 330 U.S. 258, 294 (1947) ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal, or though the basic action has become moot."); *cf. Willy v. Coastal Corp.*, 503 U.S. 131, 139 (1992) (Rule 11 sanctions allowed even when court lacked subject-matter jurisdiction over the underlying case).

These classic formulations of the contempt power do not help Brown. The City did not violate any court orders, formal or informal, when it cut the tree down. The federal court never entered a temporary restraining order, and its October 28th decision rejected Brown's motion for a preliminary injunction at the same time it dismissed his case as a matter of law. On October 30th, there was no court order that the City could have violated. By the time the federal proceeding started, moreover, the state court's

temporary restraining order had expired by its terms.  Appreciating this reality, the federal judge told the parties soon after the removal of the case to federal court that "I would expect that between now and the time the Court issues its decision, . . . if the city undertakes or concludes that it intends to take action, I would expect the city to notify plaintiff's counsel and the Court immediately." R.34 at 116.  The City agreed to comply with this informal arrangement, and, literally speaking, it did.  When the City felled the tree, it was not acting "between now and the time the Court issues its decision," *id.*, as the court had signed its merits decision two days before and entered its final judgment one day before.

Brown to his credit appreciates that none of these conventional grounds for issuing a contempt sanction applies.  He instead invokes the federal courts' "inherent power" to sanction the parties and lawyers in front of it, relying on *Chambers v. NASCO, Inc.*  In *Chambers*, the plaintiff gave formal notice under Civil Rule 65 that it would seek a temporary restraining order against the defendant to prevent the transfer of certain property. 501 U.S. at 36.  Before the complaint was filed, the defendant tried to dispose of the property, and, when the litigation began, the defendant filed "a series of meritless motions and pleadings" and obstructed the lawsuit through other "delaying actions." *Id.* at 38 (internal quotation marks omitted).  The Supreme Court affirmed an award of sanctions based on the defendant's attempt to deprive the court of jurisdiction through fraud and other "tactics of delay, oppression, harassment and massive expense," *id.* at 41 (internal quotation marks omitted), even though some of the bad conduct had occurred *before* any litigation had started (but after the plaintiff had given notice of the lawsuit), *see id.* at 54 n.17.

*Chambers*, it is true, establishes that the federal courts have limited inherent power to protect their jurisdiction through sanctions.  But it is at least one step removed from the sanction imposed here.  After the district court announced its decision, Brown told the City that he planned to refile the action in state court.  On this record, to the extent the City's actions were designed to deprive a court of jurisdiction, it was the state courts' jurisdiction that the City's action undercut.  Had Brown refiled the state law

claim in state court, *Chambers* at most might have suggested that a sanctions motion under state law would be appropriate, *see Stancourt v. Worthington City Sch. Dist. Bd. of Educ.*, 841 N.E.2d 812, 830 (Ohio Ct. App. 2005), on the ground that the City prevented the state courts from exercising jurisdiction over the claim he told the City he was about to file, *cf. Porter v. Lee*, 328 U.S. 246, 251 (1946) ("[W]here a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo."). This is not what happened, however. Even had Brown followed through on the plan to refile in state court, that at most would have empowered the state courts, not the federal courts, to sanction the City's conduct. A federal court's inherent power concerns efforts to "manage [its] *own* affairs," not the affairs of another sovereign's court. *Children's Ctr. for Developmental Enrichment v. Machle*, 612 F.3d 518, 524 (6th Cir. 2010) (alteration and emphasis in original) (internal quotations omitted).

The question here relates not only to alleged misconduct with respect to another court's jurisdiction but also to conduct that occurred *after* the federal court dismissed the case. *Kokkonen v. Guardian Life Insurance Company of America*, 511 U.S. 375 (1994), shows that the federal court's inherent authority to continue to exercise jurisdiction over parties once before it is finite. In *Kokkonen*, one month after the district court dismissed a case in connection with a settlement between the parties, a party asked the district court to enforce a provision of the settlement. The district court agreed to do so, invoking its "inherent power." *Id.* at 377. The Supreme Court reversed, holding that the court lacked jurisdiction because the "power asked for here is quite remote from what courts require in order to perform their functions." *Id.* at 380.

As in *Kokkonen*, a federal court's unspoken authority to "manage its proceedings, vindicate its authority, and effectuate its decrees," *id.* at 379–80, remains limited—and here does not include the power to punish conduct that did not violate any court order, that occurred after the dismissal of the case and that occurred after the allegedly injured party signaled it would return to state court, not federal court. Once the district court dismissed Brown's request for an injunction and once it dismissed all of the claims, as

opposed to remanding the state law claims to state court, *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351–52 (1988), there was no reason in law that the City could not act. And given the reality that the parties were fighting over the public-safety risks presented by a dying tree, there was some reason to think the City might act. In the absence of a court order, a party is not obligated by law, as opposed to the customs of trust in the local bar, to comply with an invisible stay.

The Federal Rules of Civil Procedure, indeed, make it clear that no automatic stay applies to such orders. While Civil Rule 62(a) provides an automatic 14-day stay before a party may execute a judgment, it conspicuously excludes a "final judgment in an action for an injunction" from this requirement. There thus "is no automatic stay in actions for injunctions." Charles Alan Wright et al., Federal Practice and Procedure, § 2904. Injunctions are "drastic and extraordinary" orders which "should not be granted as a matter of course," *Monsanto Co. v. Geertson Seed Farms*, __ U.S. __, 130 S. Ct. 2743, 2761 (2010), and accordingly the failure to obtain one does not automatically lead to a temporary injunction. Even had Brown filed, or given notice he would file, a post-judgment motion or an appeal, that might have changed the nature of this dispute, but it would not have entitled him to an automatic stay. *See Hovey v. McDonald*, 109 U.S. 150, 161 (1883) ("[A]n appeal from a decree granting, refusing, or dissolving an injunction does not disturb its operative effect."); *Deering Milliken, Inc. v. F.T.C.*, 647 F.2d 1124, 1129 (D.C. Cir. 1978) ("[T]he vitality of [the district court's] judgment is undiminished by pendancy of the appeal. Unless a stay is granted either by the court rendering the judgment or by the court to which the appeal is taken, the judgment remains operative.").

The traditional way to obtain a stay after the dismissal of a request for an injunction is under Civil Rule 62(c), which allows a court to "suspend, modify, restore, or grant" an injunction pending appeal. Once the district court dismissed Brown's case without granting a stay under Civil Rule 62(c), however, the City was "free to take the action sought to be enjoined," Wright et al., § 2904—namely, to cut down the tree. *See Air Line Pilots Ass'n, Int'l v. United Air Lines, Inc.*, 853 F.2d 528, 529 (7th Cir. 1988)

(per curiam) (once an injunction was found inapplicable to plaintiffs, "no civil contempt for violating that injunction could stand"); *Dakota Corp. v. Slope Cnty.*, 75 F.2d 584, 586 (8th Cir. 1935) (holding that defendant's act of selling property after the lower court had denied a temporary injunction was "advisedly done" and did not constitute contempt); *see also MacMann v. Titus*, 819 F.2d 8, 9 (1st Cir. 1987) (sale of property that plaintiff had sought to obtain via an injunction was a "permissible action in the absence of a stay order secured under [Civil Rule] 62").

That is not all. Courts may issue injunctions "only if the movant gives security." Fed. R. Civ. P. 65(c). The rule protects the enjoined party from any "pecuniary injury that may accrue [while] a wrongfully issued equitable order remains in effect," Wright et al., § 2954, and requires a court to "consider[] the question of requiring a bond" before it issues an injunction, *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978). That was no small matter here, as the City had found that the tree raised a serious risk of injury to passers-by and thus of potential liability to the City. As these provisions confirm, an automatic stay did not spring into existence upon the issuance of the court's ruling, and it is by no means certain that a request for a stay pending appeal (had one been sought) would have been granted.

*Merrimack River Savings Bank v. City of Clay Center*, 219 U.S. 527 (1911), does not change matters. In *Merrimack*, a plaintiff filed a lawsuit against a power company in federal court and obtained a temporary injunction to prevent the destruction of power lines and poles over which the plaintiff had security rights. *Id.* at 532–33. The lower court dismissed the case for want of jurisdiction, and the plaintiff appealed the case to the Supreme Court, during which time the lower court injunction remained in place. *Id.* at 533. After a hearing, the Court issued an order dismissing the appeal. *Id.* Before the plaintiff had a chance to petition for rehearing, the power company cut down the power lines. *Id.* The Court found the power company in "contempt of the appellate jurisdiction of this court." *Id.* at 535–36.

In contrast to this case, *Merrimack* relied on the presence of a continuing lower court injunction, which the Court held is "neither suspended nor annulled as a mere

consequence of an appeal to [the Supreme Court]." *Id.* at 534; *see also Dakota Corp.*, 75 F.2d at 586 (distinguishing *Merrimack* on these grounds). At most, *Merrimack* stands for the proposition that one court can sanction a party for failing to abide by another court's continuing injunction. No such order existed here, whether trial or appellate, whether state or federal, which is why we agree with the district court that *Merrimack* turns on the violation of an existing injunction, not on the federal courts' inherent authority.

In the final analysis, it may well be true that the City did not play by the Marquess of Queensberry rules. And one day it may happen that the City will be on the receiving end of comparable conduct. Still, this reality remains: The City did not violate any existing order of the federal court, the traditional ground for invoking the contempt power. While Brown signaled, after the district court's ruling, that he would pursue his state court claim in state court, that did not permit the federal court to invoke *its* inherent sanction authority. "[C]ourts have finite bounds of authority, . . . which exist to protect citizens from . . . the excessive use of judicial power." *U.S. Catholic Conference v. Abortion Rights Mobilization, Inc.*, 487 U.S. 72, 77 (1988). Because a federal court's inherent powers carry great "potency," they must be exercised with "restraint and discretion," *Chambers*, 501 U.S. at 44, and we see no cognizable basis for invoking them here.

III.

For these reasons, we vacate and remand.